THE SCHMIDT *v.* THE READING.[1]

THE READING *v.* THE SCHMIDT.

*(District Court, E. D. Pennsylvania.* March 28, 1890.)

1. COLLISION—BETWEEN STEAM AND SAIL.
    A schooner, close-hauled on her port tack, heading nearly north, and making about five miles an hour, and a steamer heading eastward, and making about eight miles an hour, were approaching on converging courses, and held their courses until within five lengths of each other, when the schooner starboarded and the steamer ported, and the vessels collided. The night was clear, and the preponderance of evidence showed that the schooner's lights could have been seen from the steamer when the vessels were at least a mile and a half apart. *Held* that, though it was not entirely clear that a collision was inevitable if the schooner had held her course, the steamer was in fault for holding her course until the vessels were in such close proximity.

2. SAME—DUTY OF STEAMER.
    A schooner on her port tack, making nearly north, and a steamer making east, were approaching on converging courses. When about five lengths apart, the steamer, having, according to her testimony, seen the schooner for the first time, ported, and stopped her engines to avoid collision. *Held,* the steamer was in fault for not also reversing her engines as well as porting.

3. SAME—CHANGE OF COURSE BY SAILING VESSEL.
    A schooner and steamer were approaching on converging courses. The former, after a collision had become apparently inevitable unless a change of course was made, starboarded, to endeavor to pass astern of the steamer. At the same time the steamer ported, and might thus have cleared her if she had continued her course. *Held,* as the steamer had improperly continued her course until the schooner was in extreme danger of collision, and as the action of the steamer whereby she might have cleared her was, under the circumstances, improper, and could not have been anticipated by the schooner, the schooner was not in fault for changing her course.

In Admiralty.

Libel by the schooner Charles E. Schmidt against the steamer Reading, and cross-libel by the Reading against the Schmidt, for damages for collision. On the night of September 23, 1889, the libelant, a coasting schooner, with a cargo of ice from Gardiner, Me., to Philadelphia, when near the Cross Rip light-ship, eastward of Vinyard Haven, sighted the respondent, running on a course converging to her own at a distance of 1½ to 3 miles away. The channel at this point is about 2½ miles wide. The wind was near north-west, and brisk. The night was clear and fine, without a moon. The libelant was close-hauled on her port tack, heading nearly north. The respondent was heading eastward; was near the center of the channel, and under common speed, making about 8 miles an hour, while the schooner was making about 5. The vessels held their respective courses until within 5 lengths of each other, when the respondent ported, and the libelant starboarded, at about the same time, and directly came into collision. Each was injured, and each is in court claiming compensation of the other.

*Curtis Tilton* and *Henry R. Edmunds,* for the Schmidt, cited, as to the duty of the steamer: The steamer should leave a safe and ample margin of space. *The Laura V. Rose,* 28 Fed. Rep. 108; *The Garden City,*

---

[1] Reported by Mark Wilks Collet, Esq., of the Philadelphia bar.

38 Fed. Rep. 862; *The City of Brockton,* 37 Fed. Rep. 899; *The City of Springfield,* 29 Fed. Rep. 923; *The Ogemaw,* 32 Fed. Rep. 922; *Wells* v. *Armstrong,* 29 Fed. Rep. 218. The steamer must shape her course to avoid collision seasonably. *The Carroll,* 8 Wall. 306. As to the change of course of the schooner: A mistake *in extremis* is not to be imputed as a fault. *The Johnson,* 9 Wall. 154; *The Carroll,* 8 Wall. 306; *The Maggie J. Smith,* 123 U. S. 355, 8 Sup. Ct. Rep. 159; *The Elizabeth Jones,* 112 U. S. 514, 5 Sup. Ct. Rep. 468; *The Cadiz,* 20 Fed. Rep. 157; *The Norwalk,* 11 Fed. Rep. 922; *The John Mitchell,* 12 Fed. Rep. 511; *The America,* 4 Fed. Rep. 337; *The Ella B.,* 19 Fed. Rep. 792; *The Farnley,* 1 Fed. Rep. 631; *The State of Alabama,* 17 Fed. Rep. 847.

*John G. Lamb* and *Thos. Hart, Jr.,* for the Reading, cited, as to the duty of a sailing vessel to keep her course: *The Free State,* 91 U. S. 200; *Steam-Ship Co.* v. *Rumball,* 21 How. 372; *The Illinois,* 103 U. S. 298. And as to the right of a vessel to deviate from her course when *in extremis: The Corsica,* 9 Wall. 630; *The Allionca,* 39 Fed. Rep. 476; *The Martello,* Id. 505; *The Clara Davidson* v. *The Virginia,* 24 Fed. Rep. 763.

BUTLER, J., (*after stating the facts as above.*) It was the respondent's duty to keep off; and, for holding her course as she did until so near the libelant, she was in fault, unless an excuse can be found for this conduct. The proximity was clearly dangerous. It alarmed the officers on both vessels, as their acts at the time show. Each sought by the most prompt and vigorous efforts to escape. The libelant's change of course may have increased the danger, in view of the respondent's sudden change, not then discoverable. Whether the collision would have been avoided if she had held her course, is not clear; indeed, I consider it very doubtful. Whether it would or not, however, the respondent was clearly in fault for approaching so near, unless she could not avoid it. She says she could not, and this is her only excuse; that the libelant's lights were not discoverable earlier; that she had a vigilant look-out, and changed her course the moment the lights came into view. I am satisfied that the libelant could and should have been seen much earlier. Her lights were burning brightly, and the night was favorable to seeing them at a distance. The respondent's lights were seen from the libelant when far away,—the witnesses say 3 miles; it is safe to say 1½ to 2 miles. Distances cannot be accurately measured under such circumstances. Why then did not the respondent see the libelant's lights earlier? The suggestion that the latter vessel had been running her southward tack, and turned just before she was seen, cannot be accepted. If she had been so running she should have been observed, and her turning must have been seen. The suggestion is based on inference alone, and it cannot stand against the positive testimony of the libelant's witnesses, who swear that the vessels were miles apart while she was running northward, and when the respondent was first seen from her deck, supported as they are by the probabilities of the case. Why should libelant shorten her southern tack by changing in mid-channel? The wind favored this tack, and she had every motive to pursue it to the south side.

On the other the wind was against her. I cannot doubt that the failure to see her resulted from negligence, notwithstanding the respondent's testimony respecting her lookout. She must therefore be treated as in fault for holding her course until the vessels were in dangerous proximity.

She was in fault also for not reversing, instead of simply porting. She was too close to rely upon the latter. It was unsafe. She might possibly have passed astern, if the libelant had held her course; but this, as before said, is quite uncertain. She should have considered the danger that libelant might falter and turn, as she did, under the circumstances in which she was placed. It was not unreasonable to suppose she would. To reverse was safe, and this the respondent should have done.

Was the libelant in fault for changing? She was required to hold her course until justified in believing that a change was necessary to avoid collision. She was not, however, required to incur greater risk,—to take the chance of a merely possible or hair-breadth escape. Did the circumstances justify a belief that the change was necessary? That she believed it necessary is clear; and she was in the best position to judge. Was her belief reasonable? She saw the respondent at a distance, and saw that she kept her course, as if ignorant of libelant's presence, or recklessly intending to cross her bows, until collision had become almost, if not quite, inevitable. A change of course in one if not both of the vessels was necessary. A continuance of the respective courses must result in immediate disaster. What was there to indicate that the respondent would change? It is no answer to say the fact that such was her duty indicated it. It was her duty to do this much earlier; but she did not. Her conduct indicated that she intended to pursue her course; that she was ignorant of the situation, or reckless of the consequences. Under the circumstances, the libelant's only chance of escape seemed to be in doing what she did. She could not anticipate the respondent's untimely and improper act. If the latter made any change at this time, it was reasonable to believe this would be by reversing and backing, for it alone was safe and proper. The libelant could have no warning of her attempt to turn as she did, until her head came around so as to exhibit her red light. Her change of course could not, therefore, be discovered until the vessels were virtually in contact. The libel is sustained, and a decree will be entered accordingly.